# KLEIN LAW GROUP

## JULIA H. KLEIN

September 17, 2021

**Via ECF**
Honorable John G. Koeltl
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:   *Gray v. Orchid Street Enterprises, LLC, et al.*
      **Civil Action No. 20-cv-10225**

Your Honor:

We are attorneys for the plaintiff, Anastasia Gray ("Gray" or "Plaintiff") in the above-captioned matter, and write jointly with counsel for defendants Orchid Street Enterprises, LLC ("OSE") and Jim Carrano ("Carrano") (together, "Defendants") (collectively, the "Parties") seeking approval of the Parties' Settlement Agreement and Release (the "Settlement Agreement") attached hereto as Exhibit A. For the reasons set forth below, the Parties respectfully request that the Court approve the Settlement Agreement pursuant to the Second Circuit's decision in *Cheeks v. Freeport Pancake House, Inc.*, 796 F.3d 199 (2d Cir. 2015). The Parties respectfully maintain that the terms of the Settlement Agreement are fair and reasonable pursuant to the factors set forth in *Wolinksy v. Scholastic Inc.*, 900 F.Supp. 2d 332, 335-36 (S.D.N.Y. 2012).

## I.   Plaintiff's Allegations and Defendants' Responses

Ms. Gray filed this action alleging that Defendants violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and the New York Labor Law ("NYLL") (the "Action"). She claims that she worked as a bartender from approximately June of 2019 through September of 2020 at a bar that Defendants owned and operated called the Skinny Bar, located at 174 Orchard Street, New York, New York 10002. Ms. Gray alleges that, at the beginning of her employment, she worked 2 shifts per week, on Fridays and Saturdays. These shifts were supposed to last from approximately 8:00 p.m. until 4:00 a.m. or from 4:00 p.m. to 2:00 a.m. In reality, however, Ms. Gray claims that the evening shifts lasted from 8:00 p.m. until approximately 5:30 or 6:00 a.m. Within a month after the beginning of her employment, Ms. Gray alleges that Defendants added Wednesday and Thursday shifts to her schedule, in addition to her existing Friday and Saturday shifts. Ms. Gray's Wednesday afternoon shift began at 3:30 p.m. and ended at approximately 11:00 p.m. to 12:00 a.m. and her Thursday evening shift began at approximately 8:00 p.m. and ended at approximately 5:00 a.m. This schedule lasted until the beginning of the Covid-19 pandemic, at which point she worked 2 shifts per week, for approximately 24 hours per week, until her termination in September of 2020.

Plaintiff alleges that Defendants failed to pay her minimum wages throughout her employment. Specifically, Ms. Gray alleged that Defendants failed to pay her for most of the weeks that she worked. In weeks in which Defendants did pay Ms. Gray, Defendants purported to apply

120 EAST 79TH STREET, SUITE 1A
NEW YORK, NEW YORK 10075
(347) 292 - 8170
JKLEIN@KLEINLEGALGROUP.COM

a tip credit towards her wages; however, Ms. Gray maintains that Defendants were unable to apply a tip credit because they failed to provide notice of the tip credit to her, and because Ms. Gray spent more than 20% of her shift performing duties that were unrelated to her service work including carrying tables, bringing up ice and refilling the ice buckets, setting up tables, carrying water, sweeping, polishing glasses after they are washed, cleaning the shelf for the glasses, cleaning the wood around the restaurant, cleaning the ice buckets, carrying chairs back to their original location at the beginning and at the end of the night, and carrying used plates, glasses and utensils for cleaning, sweeping floors of the entire establishment, including the bathrooms.

Ms. Gray also alleges that Defendants unlawfully retained tips and failed to provide her with rate of pay notices when Defendants hired her, and failed to provide her with compliant pay stubs every week. Ms. Gray also asserts that Defendants terminated her employment when she raised some of these issues with Defendants' management and as result, she pled retaliation claims against Defendants.

Defendants vehemently deny Ms. Gray's allegations. Specifically, Defendants dispute Plaintiff's recollections of the dates and time periods in which she worked. Defendants also vigorously dispute the allegations that they misappropriated tips. Defendants further maintain that Plaintiff resigned from her employment and was not fired; thus eliminating any potential for recovery on the retaliation claims. Defendants also dispute Plaintiff's damage calculations.

## II. Discovery

During discovery, Defendants produced a host of records, including tip sheets and time records, which called into question Plaintiff's allegations regarding the number of hours that she worked and that Defendants misappropriated her tips. Defendants also maintain that they can provide witness testimony to establish that Plaintiff worked minimal side work and that Plaintiff was informed of the tip credit when she was hired.

Additionally, as a bar/lounge, Defendants' business was significantly impacted by the COVID-19 pandemic and Defendants produced confidential financial records demonstrating that they may be unable to satisfy a large judgment if Plaintiff ultimately prevailed in her claims.

## III. The Settlement is Fair and Reasonable

As articulated in *Wolinksy*, when assessing the fairness of a settlement a court should consider the totality of the circumstances including but not limited to several factor such as: (i) the range of possible recovery; (ii) the extent to which the settlement will enable the parties to avoid anticipated burdens and expenses in establishing their respective claims and defenses; (iii) the seriousness of the litigation risks faced by the parties; (iv) whether the settlement agreement is the product of arm's length bargaining between experienced counsel; and (v) the possibility of fraud or collusion. *See Wolinsky*, 900 F.Supp. 2d at 335. The Parties have agreed on a $36,000 settlement. Based on an analysis of these factors, the Parties respectfully request that the Court approve the Settlement Agreement and deem it fair and reasonable.

## A.     The Range of Possible Recovery

After receiving the Defendants' document production, the undersigned prepared a damage calculation spreadsheet based on the review of the records. Plaintiff's counsel utilized the time records produced by Defendants to prepare the damage calculation spreadsheet and assumed, based on the records produced, that Ms. Gray worked an average of 7.71 hours per shift. Plaintiff was able to ascertain the number of shifts that Plaintiff worked by reviewing both the time records and tip sheets. Plaintiff based the number of hours Plaintiff worked on a combination of (i) the time records produced, (ii) Plaintiff's recollections, (iii) tip sheets, which occasionally had notations showing clock in times, and (iv) text messages that were produced showing scheduled start times of shifts. Based on the analysis of these records, Plaintiff calculated that Defendants owed Plaintiff approximately $12,730.35 in unpaid wages.

This $12,730.35 figure is exclusive of liquidated damages, but if Plaintiff were to establish that Defendants' violations were willful, she would be entitled to recover another $12,730.35 for a total of $25,460.70 in back wages and liquidated damages. Plaintiff also calculated that she is owed another $10,000.00 in consideration for her Wage Theft Prevention Act claims (i.e., Defendants' alleged failure to provide her with a rate of pay notice at the time of hire and accurate pay stubs).[1] With respect to Plaintiff's retaliation claims, Plaintiff estimates that she would have been entitled to approximately $25,000.00 based on her efforts at mitigating damages and garden variety emotional distress claims.

These calculations reflect a best case scenario for Plaintiff and do not factor Defendants' defenses or the fact that Defendants' business is experiencing financial hardship due to the Covid-19 pandemic, and that Defendant could either declare bankruptcy or become insolvent. These calculations also do not factor in the fact that the proceedings could carry on and the inherent risks and uncertainties of proceeding to a jury trial. Nevertheless, as negotiated, Plaintiff in this settlement will receive 100% of the back pay, 100% of the alleged liquidated damages owed, and 100% of the statutory damages she is entitled to pursuant to the New York State Wage Theft Prevention Act.

## B.     The Seriousness of the Litigation Risks Faced By the Parties

Considering the risks and uncertainty of trial, and the stability of Defendants' business in a post-Covid environment, Plaintiff's counsel believes that this settlement is a fair result and should be approved. While Plaintiff believes in the strength of her claims, Defendants assert that they have evidence contradicting Plaintiff's claims regarding her wages and hours worked. Indeed, Defendants have already produced comprehensive tip records demonstrating that only food service workers participated in the tip pool, and they have produced time records demonstrating that Plaintiff did not work all of the hours she alleged. Defendants also maintain that they can produce witnesses attesting that Plaintiff resigned from her position and was not terminated by Defendants, as Plaintiff alleges. Aside from the factual disputes, the Parties also have divergent legal views on

---

[1] The records produced in discovery indicate that Plaintiff worked only a handful of spread of hours shifts, so the potential recovery for this claim would be *de minimus*.

this case regarding the amount of Plaintiff's alleged damages for minimum wages violations and whether she is entitled to such damages at all.

Both Plaintiff and Defendants claim they have witnesses who would testify regarding the work duties actually performed by Plaintiff. It is certainly possible that Plaintiff's recovery at trial would have been substantially less than the proposed settlement amount. Because of the anticipated risks and costs involved in pursuing this matter through discovery and trial, settlement is an effective means of resolving the litigation for both parties.

### C. The Settlement Negotiations Occurred At Arm's Length

From the onset of this Action, the Parties engaged in communications and discussion in an effort to settle this matter. The Parties are represented by separate counsel and all discussions occurred at arms' length without any collusion.

### D. Courts Have Approved FLSA Settlements With Installments

As the Court will notice, the settlement sums are to be paid out over 20 installments. This should not be an obstacle to approving the Settlement Agreement. As an initial matter, Courts often approve settlements that require comparable payment plans. *See e.g., Sanchez v Alan's R E 99 Cents & Up Inc.*, Index No. No. 16-cv-1881, 2018 U.S. Dist. LEXIS 70647, at *6-7 (E.D.N.Y. Apr. 24, 2018) (recommending approval of a settlement with 19 monthly installments); *Zelaya v G. Gen. Constr., LLC*, Index No. 18-cv-4473, 2018 U.S. Dist. LEXIS 176171, at *2 (S.D.N.Y. Oct. 11, 2018) (approving settlement where Defendants must pay the settlement sum in 18 installments, beginning with an initial installment of $7,750, followed by 17 installments of $1,000 each). The payment plan in this Action, where Defendants must pay $7,500 within ten days following approval, another $5,500 thirty days after the first installment is made, $1,277.91 30 days after the second settlement installment is made, and then $1,277.77 in seventeen subsequent monthly installments, is fair and reasonable. As noted above, Defendants produced confidential financial records showing the dire financial condition they are in as a result of the COVID-19 pandemic.

In order to protect Plaintiff's interests over a prolonged payment plan, the Parties negotiated a settlement agreement where both the individual and corporate Defendants would be required to enter into a confession of judgment, which Plaintiff would be able to enforce in the event of a default. Moreover, pursuant to the terms of the confession of judgment, Defendants would jointly and severally owe Plaintiff three times the amount of any sum outstanding in the event of a default under the Settlement Agreement. Finally, the Parties agreed that this Court shall retain jurisdiction to enforce the Settlement Agreement in the event of default, which would ensure timely relief to Plaintiff in the event of default. With these protections, the Parties respectfully maintain that the Court should approve the Settlement Agreement, even though it contains a payout plan spanning 20 months.

### E. Plaintiff's Counsel is Entitled to Reasonable Attorney's Fees and Costs

The Settlement Agreement also provides for reasonable attorney's fees and costs. Pursuant to the undersigned's engagement agreement with Plaintiff the firm will be reimbursed $11,564.68 in fees, representing 1/3 of the recovery after costs, and $1,302.48 for costs.[2]

The contingency fee Plaintiff agreed to in her retainer agreement with the Klein Law Group of New York PLLC should be approved. *In re Lawrence*, 24 N.Y. 3d 320, 339 (2014) ("Absent incompetence, deception or overreaching, contingent fee agreements that are not void at the time of inception should be enforced as written."). "A contingency fee is presumptively valid where 'the proposed fee amount is exactly one-third of the net settlement amount,'" as it is in this case. *Angamarca v. Hud-Moe LLC*, Index No. 18-cv-1334, 2018 WL 6618412, at *1 (S.D.N.Y. Dec. 17, 2018) (*quoting Yunjian Lin v. Grand Sichuan 74 St Inc.*, Index No. 15-cv-2950, 2018 WL 3222519, at *5 (S.D.N.Y. July 2, 2018).

Furthermore, "courts in this Circuit have routinely found an award representing one third of the settlement amount to be reasonable." *Yong Yuan Wang v. Mandarin Glen Cove, Inc.*, Index No. 18-cv-03266, 2019 WL 5695910, at *2 (E.D.N.Y. Sept. 30, 2019) (*citing Romero v. Westbury Jeep Chrysler Dodge, Inc.*, Index No. 15-cv-4145, 2016 WL 1369389, at *2 (E.D.N.Y. Apr. 6, 2016). Most recently, the Second Circuit has held that there is no reason to limit attorneys' fees in FLSA actions to 33.33% of the amount recovered. *See Fisher v. SD Prat. Inc.*, 948 F.3d 593,603 (2d Cir. 2019) ("Neither the text nor the purpose of the FLSA ... supports imposing a proportionality limit on recoverable attorneys' fees," because such a rule would be "inconsistent with the remedial goals of the FLSA").

Notably, the fees requested here are lower than lodestar of approximately $15,190, as reflected in the Klein Law Group of New York PLLC's contemporaneous billing records. *See* Ex. B. The fees and costs requested are fair and reasonable as being less than the lodestar (*see id.*), as being consistent with the terms of Plaintiff's retainer agreement with the Klein Law Group of New York PLLC, and as amounting to a fair and reasonable payment in light of the "considerable risk" that the Klein Law Group of NY, PLLC undertakes by representing employees in wage-and-hour cases on a contingency fee basis. *See, e.g., Sanchez v. JMP Ventures, L.L.C.*, Index No. 13-cv-7264, 2015 WL 539506, at *6 (S.D.N.Y. Feb. 10, 2015). Accordingly, the Klein Law Group of New York PLLC respectfully requests that the Court approve the one-third contingency fee and reimbursement of its costs incurred in this case as fair and reasonable.

The Klein Law Group of New York PLLC represents both plaintiffs and defendants in litigating claims arising out of the employment relationship including claims for wage and hour violations, employment discrimination, whistleblower retaliation, and contract disputes. I am the principal attorney of the Klein Law Group of New York PLLC. I graduated from Fordham Law School in 2006 and worked at the firm of McKee Nelson, LLP from approximately2006 through-2009. I then practiced at the firm of Murtha Cullina, LLP from approximately 2011to 2013. From 2013 to 2017 I worked at Robinson & Cole LLP and then began working at the City of New York's

---

[2] Costs include a filing fee with the Southern District of New York for $402.00, and four attempts of service of process (two attempts each for the corporate defendant and the individual defendant – the first attempt at personal service occurred when Skinny Bar was closed due to Covid-19 related shut downs) for a total of $900.48.

Housing and Preservation Department from 2017-2019. Following that I opened the Klein Law Group of New York PLLC, a firm that focuses primarily on employment law. I typically charge an hourly rate of $350 per hour.

We thank the Court for consideration in this matter.

Respectfully submitted,

*/s/ Julia H. Klein*

Cc: Counsel for Defendants (via ECF)